UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ARTHUR GONZALEZ, as Administrator )
For the Estate of Richard J. Gonzalez, )
Deceased, ) 13-2115
 )
         Plaintiff, )
 )
   v. )
 )
FORD COUNTY, MARK )
DORAN, THOMAS HENRY, )
WILLIAM WILLIAMS, FORREST )
TARDIFF, and JACKIE CORNETT, )
 )
         Defendants. )

## STATEMENT OF REASONS AND
## ORDER ON MOTION TO CERTIFY APPEAL AS FRIVOLOUS

      The plaintiff, Arthur Gonzalez, commenced this lawsuit as the administrator for the estate of his son, Richard J. Gonzalez ("Gonzalez"), who died while in custody at the Ford County Jail. The plaintiff proceeds pursuant to 42 U.S.C. § 1983 and state law. The plaintiff sued Ford County, Ford County Sheriff Mark Doran, and correctional officers/sheriff's deputies Thomas Henry, William Williams, Forrest Tardiff, and Jackie Cornett. Count I alleges an Eighth Amendment violation against the five individual defendants. Count II alleges a *Monell* claim against Ford County and Sheriff Doran in his official capacity. The remaining claims arise under State law: wrongful death (Count III); intentional infliction of emotional distress (Count IV); conspiracy (Count V); *respondeat superior* (Count VI); and a claim under the Local Government and Governmental Employees Tort Immunity Act (Count VII).

      The defendants have filed a motion for summary judgment. The motion is fully briefed and the case was set for trial to begin on December 14, 2015. The final pretrial conference was scheduled for December 4, 2015. The court recognized from the briefing that the issues were complex and the parties' preparation for the pretrial conference would be time-consuming so, to give them an abundance of time to prepare and to accommodate medical absences in chambers, as well as out-of-town Thanksgiving week travel, the court entered a text order denying the motion for summary judgment with a written order to follow. The text order was intended to notify the parties that the case would be going to trial as scheduled. The defendants, however, took it as an opportunity to appeal the court's denial of qualified immunity, which is the only basis for interlocutory appeal.

      The Seventh Circuit has remanded the case to allow the court to enter a statement of reasons for the denial of summary judgment, "particularly with regard to defendants' assertion that they are entitled to qualified immunity." *See* Order of USCA, d/e 107. The Seventh Circuit has also asked the court to rule on the motion to certify the defendants' appeal as frivolous.

### BACKGROUND

#### May 15, 2012

      Gonzalez was convicted of theft in Ford County, Illinois, and was taken into custody at the Ford County Jail to await transfer to the Illinois Department of Corrections. At that time, the Ford County Jail

had a contract with Advanced Correctional Healthcare ("ACH") which provided medical services to the Ford County inmates. A nurse and doctor went to the jail as needed, and at all other times were available by telephone for consultation.

May 18, 2012

During the evening shift (4 p.m. to midnight) at the Ford County Jail, Sheriff's Deputy Ryan Clark ("Clark") heard a commotion in cell block 20. Clark responded and saw Gonzalez lying on the ground shaking and convulsing. Clark believed that Gonzalez was having a seizure and called the jail nurse to the cell block. The nurse called for an ambulance.[1] Clark stayed with Gonzalez while waiting for the ambulance and saw Gonzalez vomit. Clark accompanied Gonzalez in the ambulance, and when they arrived at the hospital Gonzalez told the doctor that his chest hurt and that he had been told he had a seizure. Clark informed the doctor that they believed Gonzalez had a seizure. The emergency room doctor opined that he did not have a seizure and ordered a shoulder x-ray. Gonzalez was prescribed some medications, given a sling for his arm,[2] and discharged. Gonzalez and Clark returned to the jail, and Gonzalez was placed back in cell block 20. Clark phoned the ACH doctor on call to inform him about the situation.

May 22, 2012

Clark and Sheriff's Deputy Mona Keenan ("Keenan") were working the evening shift. Keenan learned that Gonzalez did not feel well and complained of chest pains. The nurse was in the jail at that time, so Keenan escorted Gonzalez to the booking/medical area. The nurse took his vital signs and decided to keep him in that area for observation while she finished with sick call. While under observation, Keenan noticed that Gonzalez vomited. The nurse consulted with the doctor, and they thought that Gonzalez was just having anxiety. The doctor and nurse believed that Gonzalez could go back to his cell. Clark and/or Keenan walked Gonzalez back to cell block 20.

The nurse then left the jail, and that evening Clark and/or Keenan learned that Gonzalez was again complaining of chest pains. Clark and Keenan went to cell block 20. Gonzalez was on the floor kicking his leg but was coherent. Gonzalez stated that he thought he was having a seizure. Keenan was unable to take his vital signs because he was not staying still. Gonzalez stated that he could not sit up, so they helped him to a sitting position and transported him by wheelchair to cell 84, which was a padded detox room that could be monitored by video. Cell 84 also had a large glass observation window in the door to facilitate visual cell checks. Keenan talked to Gonzalez on the way to cell 84 to get as much information as possible before she phoned the doctor. Gonzalez was able to respond verbally. On the way to cell 84, Gonzalez slumped over in the wheelchair, but Keenan could not tell if it was voluntary or involuntary.[3] She did not perceive him to be losing consciousness. Keenan phoned the doctor on call and relayed her conversation[4] and observations about Gonzalez. The doctor said to keep Gonzalez under observation and to take him to the ER if his condition worsened. At the doctor's suggestion, Keenan tried again to get Gonzalez's vital signs. She succeeded in doing so; she does not recall his vital signs being abnormal at that point. Keenan phoned the doctor again and told him the results.

---

[1] The ambulance company is located in the immediate vicinity of the jail.

[2] The record indicates that Gonzalez had had a shoulder injury several years earlier. A broken scapula was not identified or treated in the emergency room.

[3] The court understands this to mean that Keenan could not tell whether, for example, Gonzalez doubled over in response to pain (voluntary) or whether he was about to lose consciousness (involuntary).

[4] "[H]e was saying random things. 'I am having a heart attack, I am having a stroke, I may be having a seizure,' but I indicated to [the doctor] when [Gonzalez] said he was having a seizure, he is speaking to me." Keenan Dep. 75. Keenan did not feel that Gonzalez was having a seizure because he could respond to questions and talk to her.

Corporal Sloan was supervising the evening shift. Before the end of the shift, Corporal Sloan ordered that the video camera in cell 84 be repositioned so Gonzalez could be better monitored from the control room. Clark went to cell 84, told Gonzalez what they were doing, and physically helped him up so they could adjust the camera. Clark got up on a ladder to move the camera so that Sloan could see as much of the cell as possible.

As midnight approached, the deputies working the night shift began to arrive. The evening shift officers made sure that the night shift officers knew of the reason for Gonzalez's transfer to cell 84, the need to observe him throughout the night, and that if his conditioned worsened, he was to be taken to the hospital. Keenan and Clark left notes/incident reports as well. Before they left, Keenan and Clark viewed Gonzalez through the glass window. Gonzalez appeared to be sleeping and snoring.

Clark, Keenan, and Sloan are not defendants in this case.

May 23, 2012

Sheriff's deputies William Williams ("Williams"), Forrest Tardiff ("Tardiff"), and Thomas Henry ("Henry") worked the night shift (midnight to 8:00 a.m.). They were supervised by Corporal Jackie Cornett ("Cornett"). Before their shift began, the evening shift officers told them that Gonzalez had been taken to the emergency room on May 18; that Gonzalez had complained of chest pain earlier that evening; and that Gonzalez thought he was having a seizure. They were informed that Gonzalez had been moved to cell 84 so that he could be monitored more closely, both by video and visually through the window or by entry into the cell. The officers were told that Keenan had spoken to the doctor, and that if Gonzalez's medical status worsened he should be taken to the emergency room. Keenan also told the night shift officers that the doctor believed Gonzalez was suffering from anxiety rather than seizures or heart problems.

Williams, Tardiff, Henry, and Cornett claim that they monitored Gonzalez frequently by video, and performed visual cell checks at least every 30 minutes.[5] Three officers went to the cell around 1:30 a.m., and one of them entered the cell (with the others in the doorway or hall just outside the cell). Although the officers are somewhat inconsistent as to what they heard and observed, they agree that there was no cause for concern. At around 3:50 a.m., officers went to cell 84 because someone had observed on the video monitor that Gonzalez had not moved his legs in a while. They entered the cell and found Gonzalez unresponsive. They noticed that parts of his body were purplish and stiff, his bladder had emptied, and they could not find a pulse. An ambulance was dispatched to the jail, and when the paramedics arrived, they told the officers to call the coroner. An autopsy revealed that Gonzalez suffered a seizure and aspiration of fluids into the lungs.

There is some evidence that Gonzalez was a heavy user of prescription anti-anxiety medications which he acquired on the street, and while at Ford County he may have experienced drug withdrawal.

ANALYSIS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any

---

[5] Cell checks are recorded through the use of an electronic device that is tapped against a particular location outside each cell or cell block, documenting the time and location of each cell check. The information is later downloaded into the computer. The downloaded report of the cell checks early on May 23 shows that cell 84 was checked at 2:09, 2:45, 3:20, and 3:26 a.m. The officers contend that they spent a bit more time on their check of cell 84 to ensure that Gonzalez was okay, but the downloaded report indicates that their checks took only moments. Cell 84 was the first of ten cells or cell blocks to be checked at 2:45 and 2:46 a.m. Cell 84 was the only cell checked at 3:26, followed by five cell blocks at 3:27 and four cell blocks at 3:28. *See* d/e 87-21, p.8.

discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

<u>Deliberate indifference to a serious medical need</u>

The Eighth and Fourteenth Amendments require prison officials to provide "adequate food, clothing, shelter, and medical care" to prisoners, and "take reasonable measures" to ensure their safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008). To establish an Eighth Amendment violation, the plaintiff must show that the inmate was harmed and that prison officials were deliberately indifferent to that harm. *Farmer*, 511 U.S. at 832; *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

Prison officials are deliberately indifferent if they (1) know about an excessive risk of harm to the inmate, and (2) disregard that risk. *Farmer*, 511 U.S. at 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Deliberate indifference has an objective component and a subjective component. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The plaintiff must show that his condition was "objectively, sufficiently serious." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). The subjective component requires the plaintiff to show that the defendant acted with a "sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834, 839) (explaining the subjective approach as recklessness in "consciously disregar[ding] a substantial risk of serious harm").

While not precisely on point, *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994), is instructive. *Plakas* was an excessive force case. The Seventh Circuit wrote,

> The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial.

*Plakas,* 19 F.3d at 1147. The same reasoning should apply to this deliberate indifference case; the decedent cannot contradict the defendants.

In this case, the defendant officers knew that the evening shift officers were so concerned about Gonzalez that several calls were made to the doctor, who instructed them to keep Gonzalez under observation and take him to the hospital if his condition worsened. Thus, they knew that his condition was objectively serious. Factual inconsistencies (discussed below) may lead a jury to conclude that they acted with a culpable state of mind.

The defendant officers state that they continually observed Gonzalez by video and performed cell checks approximately every 30 minutes. However, the quality of the video was not good; one defendant officer described it as "fuzzy." The evening shift officers entered cell 84 to reposition the camera, but no one did so during the night shift, even though Gonzalez moved during the night and at some point only his legs could be seen on the monitor.

The officers performing the cell checks claim to have heard Gonzalez snoring from outside the cell, leading to the conclusion that the sound was loud enough to hear through a closed cell door. However, loud noise in a cell block alerts the control room of the need to communicate via intercom. The intercom system did not alert, so the trier of fact must consider whether Gonzalez's snoring could have been loud enough to hear outside the cell, but not loud enough to alert the control room.

One or more officers who performed cell checks that night stated that they spent extra time doing cell checks at cell 84. However, the digital printout shows that any extra time spent at cell 84 was mere seconds. One officer claimed to have observed Gonzalez long enough to see his chest rise and fall with respiration, but upon questioning he could not be sure if the flutter of Gonzalez's shirt might have been caused by drafts or air flow into the cell.

Perhaps the fact most undermining the officers' claim of sufficient observation is the fact that the uncontested evidence points to a time of death several hours earlier than the officers acknowledge. Illinois State Police Sergeant Kenneth Massey and Special Agent Chris Koerner interviewed the defendant officers soon after Gonzalez's death. Sgt. Massey wrote a narrative of each interview. Sgt. Massey also found what he described as "anomalies and implausibilities" in the content of the interviews. Sgt. Massey was disturbed with the officers' statements that they observed signs of life (movement of legs, respiration, snoring) during cell checks and on video, but when Gonzalez was checked at approximately 3:50 a.m., he was in rigor mortis. Based on Sgt. Massey's training, he knew rigor mortis to begin two to four hours after death.

Sgt. Massey believed that the night shift officers had provided false information (*i.e.*, that Gonzalez was alive approximately 30 minutes before he was found dead) and asked Illinois State Prosecuting Attorney Ed Parkinson if he would be willing to prosecute the officers for official conduct and/or perjury. Sgt. Massey was advised to further question the night shift officers "but each person maintained their version of events, despite the submission of the evidence of the empirical science of rigor mortis." *See* d/e 90-15, p. 2-3. In March 2013, Attorney Parkinson informed Sgt. Massey that criminal charges would not be filed.

The decision not to criminally prosecute the officers appears to have been under consideration for the better part of a year. This suggests that there is a close question to be decided by a trier of fact. The defendants say Gonzalez was alive at the 3:30 a.m. cell check but at 3:50 a.m. they discovered his body in rigor mortis. A trial is needed to resolve whether the officers were deliberately indifferent to Gonzalez's serious medical needs. A trier of fact could conclude that the cell checks and video observation were so inadequate that they violated Gonzalez's constitutional rights.

### Qualified immunity

The defendants claim that they are entitled to qualified immunity. The court's inquiry requires two findings: whether the plaintiff claims a violation of constitutional rights, and whether those rights were clearly established at the time of the constitutional violation. *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011). The defendants argue that there is no clearly established right requiring a prison official to override the judgment of medical professionals. *See Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006). However, in this case, medical professionals instructed the officers to keep Gonzales under observation and transport him to the hospital if his condition worsened.

5

To comply with that instruction, officers were charged with observing Gonzalez closely enough to assess his condition. As noted above, the objective evidence shows that Gonzalez was in rigor mortis approximately twenty minutes after a cell check and continual video monitoring.

There is a question of fact as to whether the defendant officers' observation of Gonzalez complied with the judgment of medical professionals.[6] Whether the defendant officers are entitled to qualified immunity must be determined by the trier of fact.

As to Sheriff Doran, however, there is no question of fact; he is entitled to qualified immunity. "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). The plaintiff argues that Doran did have personal involvement and cannot assert an "ostrich defense," citing *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991). Doran was not an "ostrich." He was not at the jail during the night shift. Doran knew that Gonzalez was taken to the hospital a few days before he died. Doran was informed that Gonzalez suffered from some medical problems on the evening of May 22, and was taken to the cell 84 to be observed. But Doran also knew that ACH's medical professionals had told the officers what to do, and confirmed that the officers were complying with that protocol. *See* Doran Dep. 65-66. Doran was not required to override the judgment of the medical professionals. *See Johnson*, 433 F.3d at 1010-11.

For the reasons stated above, the court would deny summary judgment as to the defendant officers. However, Sheriff Doran is entitled to qualified immunity on Count I.

## Monell liability

The plaintiff contends that Sheriff Doran, acting in his official capacity as a policymaker, subjects Ford County to municipal liability due to the absence of policies, practices, and procedures regarding the monitoring of seriously ill prisoners. *See Harris v. City of Marion, Ind.,* 79 F.3d 56, 58 (7th Cir. 1996). To prevail on this claim, the plaintiff must show that the custom, policy or practice was the "moving force" behind the constitutional violation. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

Where the plaintiff seeks to impose municipal liability due to the absence of policies, practices, and procedures, he must show that the absence amounts to a policy. *Harris*, 79 F.3d at 59. To do so, the plaintiff must show "a pattern or series of incidents of unconstitutional conduct or a clear constitutional duty to take action because the situation was certain to recur . . . and the inaction must amount to deliberate indifference, so that it is fair to infer that the inaction is itself a 'policy.'" *Harris*, 79 F.3d at 59.

The plaintiff argues that there were no policies or practices in place for the monitoring of seriously ill inmates in cell 84, or who was to be placed in cell 84, or under what circumstances. There was no policy for more frequent cell checks other than what is required for all incarcerated individuals (*i.e.*, every 30 minutes). However, the lack of specific policies or practices was not the moving force of the violation in this case. Circumstances dictate what is reasonable, and when medical issues are involved, such decisions should be made on a case-by-case basis as needed for each particular inmate who is ill.

The plaintiff also contends that Sheriff Doran did not ensure that the video equipment was working properly. It is uncontested that the video equipment was not in good working order that night. Doran states that the jail had been struck by lightning twice in the previous two or three months,

---

[6] The defendants argue that Gonzalez died of a terminal seizure, from which he could not have been resuscitated. That fact is not dispositive. Had his condition noticeably worsened, with emergency transport before the seizure occurred, the outcome might have been different.

6

rendering the video equipment inoperable. The company that repaired and maintained the equipment had been to the jail numerous times to restore the equipment to good working order. Doran believed that it *was* operating properly when Gonzalez died, but he later learned that the video *recording* equipment was not working. The existence of a recording is not a constitutional issue, nor would a recording necessarily represent the quality of real-time video displayed on the monitor. It is uncontested that the video monitoring equipment was operating that night.

The plaintiff's arguments also fall short on municipal liability because he cannot show the requisite pattern or series of incidents at Ford County, or any indication that the situation was certain to recur. *Harris*, 79 F.3d at 58-59. The plaintiff cites *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004) for the principle that a pattern need not be shown; one serious event is sufficient. However, *Woodward* is distinguishable. In that case, a pretrial detainee committed suicide at the Lake County Jail. The defendant failed to adhere to its own suicide prevention procedures despite a known risk of suicide posed by that inmate. *Woodward*, 368 F.3d at 924-25. *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) is also cited by the plaintiff; it, too, is inapposite. In *Vodak*, the Chicago police superintendent was in his headquarters during a demonstration in which hundreds of protestors were arrested, "not only monitoring [the demonstration] but also approving the decisions of his subordinates . . . to make the mass arrests." *Vodak*, 639 F.3d at 748.

The plaintiff has not met his burden to survive summary judgment on the *Monell* claim.

The plaintiff's remaining claims arise under State law. At this point, the defendants' pending appeal places the State claims on the back burner. If the Seventh Circuit decides that the defendants are entitled to qualified immunity, the court will dismiss the State claims and the plaintiff may pursue them in State court. *See* 28 U.S.C. § 1367 (c), (d). If the Seventh Circuit finds that one or more of the constitutional claims should proceed to trial, the viability of the State claims will be determined at a later date.

Motion to certify appeal as frivolous

The court must also rule on the plaintiff's motion to certify the appeal as frivolous [106]. An interlocutory appeal of a denial of qualified immunity results in a stay of all proceedings in the district court. *See Apostol v. Gallion*, 870 F.2d 1335, 1338 (7th Cir. 1989). There is an exception, however, when the appeal is a sham. *Apostol*, 870 F.2d at 1339. If the court certifies the appeal as frivolous, the district court retains jurisdiction and may proceed to trial. *Apostol*, 870 F.2d at 1339. However, the district court must use restraint even when the appeal seems to lack merit. *Apostol*, 870 F.2d at 1339. Consequently, a certification of frivolity is rarely granted, and this case is no exception. The motion to certify the appeal as frivolous [106] is denied.

The clerk's office is directed to send a copy of this order to the Seventh Circuit Court of Appeals.

Entered this 16th day of December, 2015.

/s/ Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE